UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MERRILL LYNCH, PIERCE, FENNER & SMITH
INCORPORATED, KUOSEN FUNG, PETER BON VISO,
MICHAEL PAUL FIX AND DANIEL GLATTER,
            Petitioners,

For an Order Pursuant to 9 U.S.C.A. §1 et seq.
Confirming an Arbitration Award

     - against -

GRETA ROTHSTEIN AND KONSTANTINOS
KARETSOS,
            Respondents.
------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF PETITION TO CONFIRM ARBITRATION AWARD**

**08 CV 00373**

Petitioners, Merrill Lynch Pierce Fenner & Smith Incorporated ("Merrill Lynch"), Kuosen Fung ("Fung"), Peter Bon Viso ("Bon Viso"), Michael Paul Fix ("Fix") and Daniel Glatter ("Glatter" and together with Merrill Lynch, Fung, Bon Viso and Fix, "Petitioners" or "petitioners"), by and through their undersigned counsel, respectfully submit this Memorandum of Law in Support of their Petition to Confirm the award of the arbitrators and directing that judgment be entered thereon, and for such other and further relief as may be just, proper and equitable, together with the costs and disbursements of this proceeding.

<u>PRELIMINARY STATEMENT</u>

The Federal Arbitration Act ("FAA") creates a strong presumption favoring arbitration and limiting review of arbitrators' decisions.[1] Arbitrator's awards are entitled to "great deference" "to

---

[1] The relevant sections of the United States Code are 9 U.S.C. §§10-11 as set forth below:
Section 10. Same; vacation; grounds; rehearing
(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration

-1-

avoid undermining the goals of arbitration; namely, settling disputes efficiently and avoiding lengthy and expensive litigation." Campbell v. Cantor Fitzgerald & Co., Inc., 21 F.Supp.2d 341,344 (S.D.N.Y. 1998) affd., 205 F.3rd 1321 (2nd Cir. 1999) cert. denied 531 U.S. 992, 121 S.Ct. 483 (2000). Moreover, "...judicial review of an arbitrator's factual determinations is quite limited," and an arbitral award may be set aside "...only in very unusual circumstances." See, Beth Israel Medical Center v. Local 814, 2000 WL 1364367 (S.D.N.Y. 2000). In its Award in the instant case, the Panel specifically held -- in relevant part -- that:

---

(1) Where the award was procured by corruption, fraud, or undue means.
(2) Where there was evident partiality or corruption in the arbitrators, or either of them.
(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.
(5) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.
(b) The United States district court for the district wherein an award was made that was issued pursuant to section 590 of title 5 may make an order vacating the award upon the application of a person, other than a party to the arbitration, who is adversely affected or aggrieved by the award, if the use of arbitration or the award is clearly inconsistent with the factors set forth in section 582 of Title 5.

Section 11. Same; modification or correction; grounds; order
In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration
(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.
(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.
(c) Where the award is imperfect in matter of form not affecting the merits of the controversy. The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.

> [f]ollowing four days of hearing ending on December 1, 2006, the Arbitrators granted respondents' Motion to Dismiss with prejudice as to Michael Paul Fix, Peter Bon Viso and Daniel Glatter. At the conclusion of the claimants' case on April 17, 2007, the remaining Respondents Merrill Lynch Pierce Fenner & Smith, Inc. and Kuosen Fung moved to dismiss the claimants' statement of claim. The arbitrators hereby grant the motion to dismiss with prejudice as to respondents Merrill Lynch Pierce Fenner & Smith, Inc. and Kuosen Fung.

(A copy of the Panel's Award is annexed to the Petition as Exhibit "A").

Specifically, with regard to Mr. Fix, the Award further asserted that "[t]he arbitrators find that Michael Paul Fix was not involved in the alleged investment-related sales practice violations and recommend that all references to this matter, NYSE Docket no. 2006-16429, be expunged from his CRD record, subject to confirmation by a court of competent jurisdiction." Further, with regard to Mr. Fung, the Award asserted that, "[t]he arbitrators find that the claims asserted against Kuosen Fung are clearly erroneous and recommend that all references to this matter, NYSE Docket no. 2006, be expunged from his CRD record, subject to confirmation by a court of competent jurisdiction."

### ARGUMENT

#### Point I

#### Under The "Great Deference" Standard, The Court Must Confirm The Award

As set forth above, Courts must afford great deference to all arbitral awards. *See, e.g., Duferco International Steel Trading v. T. Klaveness Shipping*, 333 F.3d 383, 388 (2nd Cir 2003); *see also Campbell v. Cantor Fitzgerald & Co., Inc.*, 21 F.Supp.2d at 341. In fact, when confronted with an arbitration award devoid of detail as to the underlying basis for the award, the award will be upheld if the Court is able to "discern *any* colorable justification for the arbitrator's judgment, even if that reasoning would be based upon an error of fact or law." *Westerbeke Corp. v. Daihatsu Motor*

*Co.*, 304 F.3d 200 (emphasis added); *see also Duferco, supra*, 333 F.3d at 391 (Holding that even a barely colorable justification for the outcome reached will save an arbitral award). In the instant case, colorable justification is self-evident from any number of independent sources.

First, the Panel could easily have found that the Karetsos' ratified each and every transaction in question. (*See* Petition at ¶14 and Exhibits D and thereto).[2] Ratification constitutes a "complete defense to unauthorized trading." *Herman v. T. & S. Commodities, Inc.*, 592 F.Supp. 1406, 1420; *see also Podgoretz v. Evans & Co., Inc.*, 1997 WL 138989 *10 (E.D.N.Y. 1997) (holding that Claimant's "failure to object to trades upon receipt of individual confirmation slips and monthly statements constitutes a ratification of those trades" demonstrated that the trading was done at his direction in accordance with his investment objectives and precluded recovery) (Copy attached hereto as Exhibit "A"). Ratification is also applicable to 10(b) actions, including those for breach of fiduciary duty, as well as common law or state law fraud claims. *See, e.g., Mihara v. Dean Witter & Co., Inc.*, 619 F.2d 814, 822 (9th Cir. 1980); *Clark v. John Lamula Investors, Inc.*, 583 F.2d 594, 604 (2nd Cir. 1978). Ratification also applies to claims for unsuitability. *See e.g. Altschul v. Paine, Webber, Jackson & Curtis*, 518 F.Supp. 591, 594 (S.D.N.Y. 1991). Ultimately, the argument has its roots in fundamental equity; namely, that an investor cannot obtain damages due a particular investment course after having authorized or acquiesced in that very course of conduct. Such "heads I win, tails you lose" propositions are not permitted by rules of equity or law. *Id.* "'The purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act."

---

[2] In fact, given the evidence adduced at the arbitration hearings, the Panel could have made no other conclusion.

*Id.*, quoting *Black v. Riker-Maxson Corp.*, 401 F.Supp. 693, 699 (S.D.N.Y. 1975).

Second, the Arbitration panel could have readily concluded that the Karetsos' failed to mitigate their damages by failing to take any action whatsoever, knowingly failing -- over a span of more than five years -- to transfer out of the allegedly improper investments, even after filing complaints -- albeit untimely ones -- about those same investments. *See e.g., Van Syckle v. C.L. King & Associates, Inc.*, 822 F.Supp. 98, 102 (N.D.N.Y. 1993) (holding that "[a] party cannot recover the part of their loss caused by their own failure to take reasonable steps to avoid further harm once they had reason to know of the wrongdoing."); *Messer v. E.F. Hutton & Co.*, 833 F.2d 909 (11th Cir. 1987) (holding that "a party cannot recover damages he could have prevented through the exercise of reasonable care and diligence") (*See* Petition at ¶14; and Exhibit F thereto).

Third, and more specifically, the Arbitration Panel could have determined -- from the evidence provided by Karetsos himself -- that Fix was not the Manager of the relevant branch at any point during which the Respondents maintained their accounts at Merrill Lynch. (*See* Petition at ¶13 and Exhibit B thereto).

In addition, there can be no question that it would be the Karetsos' burden to demonstrate that the Award should be amended or vacated and that, *absent meeting such burden*, the Award *must* be confirmed. *See, Campbell v. Cantor Fitzgerald & Co., Inc.*, 21 F.Supp.2d at 345. Insofar as Respondents have yet to file an actionable claim to vacate the Award, any filings at this juncture should be deemed untimely as in excess of 90 days have passed since service, and receipt, of the Arbitration Award. *See*, 9 U.S.C.A. § 12. As any allegation of corruption, fraud, undue means, partiality, misconduct or the exceeding of their powers on the part of the arbitrators, or any one of them, would be absolutely without merit, Petitioners submit that any allegation of the same be

disregarded as fallacious and that this Court should award Petitioners the costs and fees necessary to address any such allegations.

## CONCLUSION

WHEREFORE, Petitioners respectfully request that an Order and Judgment in the form of the proposed Order and Judgment enclosed as Exhibit "G" to the Petition be entered forthwith Confirming the Arbitration Award and directing the expungement of all references to this Arbitration and the claims set forth therein from Mr. Fix's and Mr. Fung's respective registration records maintained by the NASD Central Registration Depository ("CRD"); awarding Petitioners their reasonable costs and expenses, including reasonable attorneys' fees, in this cation; and granting the Petitioners any such other and further relief as this Court deems just and proper.

Dated: New York, New York
       January 15, 2008

Respectfully submitted,

Neal Brickman (NB0874)
Ethan Leonard (EL2497)
The Law Offices of Neal Brickman
Attorneys for Merrill Lynch, Bon Viso, Fung,
    Fix and Glatter
317 Madison Avenue - 21st Floor
New York, New York 10017
(212) 986-6840

To:   Konstantinos Karetsos
      42-44 Despos-Sechou
      Athens 117 43, Greece
      011-30-210-922-8461

Greta Rothstein
42-44 Despos-Sechou
Athens 117 43, Greece
011-30-210-922-8461

# EXHIBIT A

Westlaw

Not Reported in F.Supp.
(Cite as: 1997 WL 138989 (E.D.N.Y.))

Page 1

H
Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.

Yehuda PODGORETZ, Plaintiff,
v.
EVANS & CO., INC. and Bernard Weinflash,
Defendants.
Yehuda PODGORETZ, Plaintiff,
v.
SHEARSON LEHMAN BROTHERS, INC. and
Claude Hayat, Defendants.

Nos. 86 CV 2681(SJ), 86 CV 2996(SJ).

March 25, 1997.

Steven Kramer & Associates by Steven Kramer, New York City, for Plaintiff.

Herrie, Feinstein, L.L.P. by Arthur G. Jakoby, New York City, for Defendants Evans & Co., Inc. and Bernard Weinflash.

Shupbach, Williams & Pavone, L.L.P. by Paul R. Williams, Garden City, NY, for Defendants Shearson Lehman Brothers, Inc. and Claude Hayat.

MEMORANDUM AND ORDER

JOHNSON, District Judge.

*1 Plaintiff Yehuda Podgoretz ("Podgoretz" or "plaintiff") has brought this action against two of his former brokers and their employers, Bernard Weinflash ("Weinflash") and Evans & Company ("Evans"), and Claude Hayat ("Hayat") and Shearson Lehman Brothers, Company ("Shearson") Podgoretz seeks damages for losses which he allegedly sustained in his securities brokerage accounts at Shearson and Evans. The case was tried before this Court over nine days from December 1995 to February 1996.

As with most lawsuits brought against brokers, the parties have presented two very different profiles of the plaintiff. At trial, the plaintiff presented himself as an uninformed novice who expressly relied on the advice and actions of others and consequently was manipulated by his brokers to their own advantage. Defendants, on the other hand, presented him as an experienced, savvy investor who controlled his accounts and became angry when his own decisions did not result in large profits. While the truth clearly lies somewhere between these two versions, this Court finds that defendants' version was strongly supported at trial by consistent and credible witnesses and documentary evidence, while plaintiff's version was not. The following constitutes this Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

FINDINGS OF FACT

Yehuda Podgoretz is a World War II veteran who arrived in this country in 1962 and eventually opened his own fur coat repair business in Queens. Tr. at 45- 48, 165-72. With the assistance of his wife, Tr. at 48, 173, plaintiff built up his business and assets, and "as a result of [his] successful efforts in business," "decided to take an early retirement" in 1975 at the age of 57. Shearson Ex. S (Podgoretz Aff. ¶ 7). See also Tr. at 363, 404, 705.

Prior to opening brokerage accounts with the defendants in this case, Podgoretz hired Nathan Weinflash, who served as both his broker and accountant, and who worked at Loeb Rhoades & Company at the time. Tr. at 174. Additionally, plaintiff maintained a brokerage account at a firm called Thomson McKinnon, Inc. for over a year, until the end of 1974. Tr. at 176. In short, this Court finds that plaintiff had securities and brokerage account experience prior to opening his Evans or Shearson accounts.

I. The Evans Account

On or about January 3, 1975, Podgoretz together with his wife, Asia Podgoretz, opened a joint

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

http://print.westlaw.com/delivery.html?dest=atp&dataid=A005580000022060002307812B...   5/6/2004

Not Reported in F.Supp.                                     Page 2
(Cite as: 1997 WL 138989 (E.D.N.Y.))

account at Evans with defendant Bernard Weinflash, Nathan's brother. Evans Ex. I; Tr. at 130-31. Upon opening the account, Podgoretz and his wife executed a customer agreement with Evans. Tr. at 130-31. The Customer Agreement provides, in part:
> Reports of the execution of orders and statements of the account of the undersigned shall be conclusive if not objected to in writing, the former within two days, the latter within ten days, after forwarding by you to the undersigned by mail or otherwise.

Evans Ex. I ¶ 7.

*2 Prior to opening this account, Bernard Weinflash met with Podgoretz so that the two could get acquainted. Tr. at 705. At that time, Weinflash asked plaintiff questions relating to his suitability to trade, including his annual income and investment objectives. Tr. at 853, 707-08, 756. Although Podgoretz was about to retire, he advised Weinflash that he would continue to have income from several sources, including from his wife's piano lessons, from his own buying and selling of diamonds, and from his daughter's artwork. Tr. at 784-87.

Podgoretz then executed account opening documents as well as a document transferring his securities from Thomson McKinnon, Inc. ("Thomson") to Evans. Tr. at 706. When the Thomson stocks were delivered into Evans in January 1975, Weinflash advised Podgoretz that in his opinion, much of that stock was speculative in nature. Although plaintiff did have some "blue-chip" or safe stocks, Tr. at 730-32, he also maintained Penn Engineering and Allis-Chalmers stock, both of which were considered highly speculative. Tr. at 708-09. Although Weinflash informed Podgoretz that these stocks were considered very risky, plaintiff held on to them for another eighteen months. See Pl.Ex. 2.

While Podgoretz presented himself at trial as completely ignorant of securities trading, and induced to rely on Bernard Weinflash "like a brother" for all decisions regarding his Evans account, this Court did not find his testimony credible. In particular, plaintiff's testimony was frequently inconsistent. For example, he initially claimed that none of his transactions at Evans were authorized beforehand, Tr. at 435, then later reduced the "all" to "70 percent," Tr. at 436, and then stated that he did not know the exact percentage of unauthorized trades. Tr. at 438. At no time did he offer any testimony to specifically identify which trades he claimed were unauthorized and which were not. Plaintiff also changed his testimony several times on whether he participated in the preparation of analyses of the trading in his account. Tr. at 304-06, 309-10, 317-18, ultimately admitting that he did, after first claiming that only his accountant, and then his wife, prepared those documents. Finally, with respect to damages, Podgoretz testified as to his losses, but ultimately admitted he was given the information by his attorney. Tr. at 276.

Additionally, it should be noted that this Court found plaintiff to give relatively articulate answers only when those answers were advantageous to him, while his ability to comprehend and speak English often became particularly low when he was faced with questions that seemed to lead him to a disadvantageous position. For this additional reason, this Court did not find plaintiff's testimony credible.

On the contrary, the testimony of three witnesses who observed and interacted with Podgoretz at the Evans' offices, presented a consistent and extremely credible description of how plaintiff directed the activities in his account. This Court therefore finds that at all times between the opening of the Evans account in 1975 and its closing in 1983, Podgoretz directed and controlled the trading in his account. Tr. at 710-11, 721-28; 840-46. Whether it was over the phone from his residence in Israel, or directly from Evans' own offices when he was in New York, Podgoretz was intimately and constantly involved in his Evans account. Specifically, when Podgoretz lived in Israel, he would communicate with Weinflash by telephone at least once a week, Tr. at 716, 101, and would also write letters. Pl. Exs. 1-9; Evans Exs. B and C; Tr. at 843. When Podgoretz was in the United States, he would go to Evans' office on a daily basis. Tr. at 725, 839. In total Podgoretz spent hundreds of days at Evans' offices directing and controlling the purchase and sale of securities and options in his account. Tr. at 725, 839, 542. Philip Frank, who shared an office with Bernard Weinflash at Evans, and Katherine Jeffers, who served as Weinflash's assistant, both credibly testified that Podgoretz would sit at an extra desk located in Frank and Weinflash's office and read financial journals and stock prices as they

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

http://print.westlaw.com/delivery.html?dest=atp&dataid=A005580000022060002307812B... 5/6/2004

Not Reported in F.Supp.
(Cite as: 1997 WL 138989 (E.D.N.Y.))

Page 3

came in over a Quotron machine. Tr. at 543, 548-49; 839-40, 850. *See also* Tr. at 725-26. Ms. Jeffers stated that Podgoretz would come in on a daily basis for up to six months a year, and would sometimes stay at the office longer than Mr. Weinflash did. Tr. at 839.

*3 When he was at Evans' offices, Podgoretz would conduct extensive research on his own regarding stocks and options, by using Evans' library, requesting and reading Standard and Poor's stock guides and company reports, Tr. at 718, 721, 839-44, 850, requesting specific stock prices, Tr. at 726, and using the Quotron machine, Tr. at 543, 726. As a natural conclusion to that research, Podgoretz placed orders to purchase and sell securities through Mr. Weinflash. On several occasions, Podgoretz would even fill out the order ticket himself and hand them to Weinflash's assistant, Ms. Jeffers. Tr. at 727, 841. When Weinflash was absent from the office or otherwise not available, Podgoretz would place the orders to buy or sell securities through Ms. Jeffers or through another Evans broker such as Philip Frank or Harry Chantakian. Tr. at 727, 544.

Plaintiff himself admitted that he prepared and maintained lists of his transactions on several occasions, Tr. at 384-85, and wrote to Weinflash requesting a new stock guide. Pl.Ex. 2. Plaintiff's wife, Asia Podgoretz, testified that Podgoretz received monthly account statements, and looked at them. Tr. at 95. Plaintiff's own exhibits include letters which reveal his directions to Weinflash that he should sell certain holdings, Pl. Exs. 1, 2, and 5, and that Podgoretz wanted short term securities.

To the extent that plaintiff did rely on Bernard Weinflash for advice, this Court does not find that fact to be inconsistent with plaintiff's otherwise active, personal involvement in his Evans account. Weinflash himself stated that Podgoretz would often ask for his opinion or recommendation regarding a particular stock, and that Weinflash would give it. Tr. at 710-11. This type of questioning is perfectly consistent with an investor who also regularly reads Standard and Poor's guides and sheets and generally tried to amass as much information as possible regarding trades before making decisions. Finally, in plaintiff's own letter dated June 3, 1983, he states that "[d]ue to my personal involvement [in my Evans account], I was able to recoup some of my losses...." Pl.Ex. 12. In other words, plaintiff himself admitted to his extensive involvement and abilities in securities trading.

A. *Options Trading in the Evans Account*

Plaintiff has particularly pointed out options trading which occurred in both his Evans and Shearson accounts as both extremely risky and done without his understanding or full approval. This Court finds that plaintiff knew and understood the risks regarding options trading and expressly pursued it despite those risks.

On or about August 31, 1978, Podgoretz opened an options account at Evans, and therefore executed a Customer's Option Agreement. Evans Exs. N; Tr. at 723. That agreement included detailed information regarding the risks of options trading. Evans Ex. N. Additionally, Weinflash told Podgoretz at that time, and on several different occasions, that options trading was a risky business. Tr. at 844-46, 723-24, 727-29. Plaintiff, however, clearly understood how options trades worked, and often placed orders for such trades himself. Tr. at 545, 547-48, 842-43. In 1980, Podgoretz executed a second Option Information Form, in which he again signed his name to a statement that indicated the use of options was suitable to his needs and that he was able to understand and evaluate the risks involved in options trading. Evans Ex. E. The 1980 form also stated that Podgoretz had received an options prospectus in 1978 and in 1980, and that by 1980 he was trading in options on a monthly basis. Evans Ex. E. Finally, it should be noted that by plaintiff's own admission, *after* he had sent letters of complaint to Evans and others regarding the options trading which was occurring in that account, he continued to trade options through his daughter's account at Shearson. Tr. at 400. Clearly, plaintiff, by his own choice and with full knowledge of the risks, continued to engage in options trading because he had always made that informed choice.

II. *The Shearson (Loeb Rhoades) Account*

*4 In January 1978, through the Jerusalem branch office of a company called Bank Leumi, plaintiff opened an account with Loeb Rhoades & Company ("Loeb Rhoades"), which later became Shearson. Specifically, Bank Leumi sent a telex to Loeb Rhoades dated January 19, 1978, requesting that a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

http://print.westlaw.com/delivery.html?dest=atp&dataid=A00558000000220600023078l2B...  5/6/2004

Not Reported in F.Supp.
(Cite as: 1997 WL 138989 (E.D.N.Y.))

Page 4

margin account be opened for plaintiff. Shearson Ex. T. Plaintiff wrote a letter confirming that request by letter dated January 26, 1978. Shearson Ex. K. Defendant Claude Hayat was the registered representative for Loeb Rhoades for the Podgoretz account throughout the time that the account was opened, from January 1978 through May 1983.

This Court finds that plaintiff clearly understood that he had opened a margin account at Loeb Rhoades. Plaintiff initially deposited $3,000.00 in cash into his account, but began making numerous purchases in that account shortly thereafter. By June 30, 1978, he had accumulated $23,482.35 negative, or debit, cash balance in his account. Shearson Ex. N (5/27/78 through 6/30/78 Account Statement). Plaintiff could not have made these purchases if he did not understand that his account was a margin account, because he had never deposited the otherwise necessary funds to make such purchases. Additionally, each monthly account statement received by plaintiff showed the extent of his month-end margin balance. Plaintiff never objected to, or even inquired as to the use of margin borrowing, despite regularly receiving these statements. Shearson Ex. N. Finally, plaintiff specifically conveyed instructions that stocks be purchased "on the margin." Shearson Ex. X.

As with his Evans account, plaintiff contends that the activity in his Shearson (then Loeb Rhoades) account was directed exclusively by his individual broker, Claude Hayat, without plaintiff's participation, and against his allegedly conservative investment objectives. Specifically, plaintiff claims that Hayat recommended *all* of the trades in his Loeb Rhoades account. This Court did not find plaintiff's testimony on this point credible. As with plaintiff's testimony regarding his Evans account, this Court found his testimony regarding the Shearson transactions riddled with inconsistencies. For example, plaintiff claimed that he never discussed his investments with Bank Leumi personnel in Jerusalem, Tr. at 291-92, but later admitted giving them orders, Tr. at 297, and receiving recommendations from them. Tr. at 296-98, 422-25. This testimony also contradicted his claim that Claude Hayat had recommended *all* his option trades, Tr. at 414, and that plaintiff never made transactions on his own. Tr. at 365-66. On another occasion, plaintiff claimed that he never called his brokers, Tr. at 366, but then admitted that he did, and that "the line was always busy." Tr. at 366.

On the other hand, this Court found the testimony of both Claude Hayat and Barbara Novack, Hayat's assistant at the time, both consistent and credible in their description of Loeb Rhoades as essentially a service center, oriented towards executing orders as they came in over the telex from Bank Leumi or over the phone with Bank Leumi personnel or plaintiff himself. Claude Hayat testified that he worked in the firm's International Department, and that he did not provide investment advice, but rather processed orders on Podgoretz' behalf. Tr. at 610-12. Barbara Novak's testimony was consistent with that description. She stated that in the six years of working with Hayat, she never heard him make a recommendation to plaintiff, Tr. at 809, and that she herself simply processed orders which plaintiff placed, and provided him information such as stock quotes and account updates. Tr. at 805-06, 809.

*5 The documentary exhibits submitted also fully support Shearson's and Hayat's description of the relationship, and contained numerous references to orders being given to Hayat and/or Shearson from Bank Leumi. See, e.g., Shearson Exs. X, GG, HH, KK. While these telexes came from Bank Leumi rather than plaintiff, plaintiff received transaction confirmation slips for each order, Pl. Exs. 13-14, and later, monthly account statements which again reflected each transaction. Shearson Ex. N. Plaintiff never once raised an objection to any of these trades, and this Court therefore concludes that they were placed by Bank Leumi personnel at his behest.

Plaintiff's own letter to Shearson dated May 1, 1983, contradicts many of his claims. Shearson Ex. I. The statements in that letter clearly rebut plaintiff's claims at trial that he did not originate any orders, and more fundamentally, that he lacked understanding of options or securities trading. To the contrary, this was clearly the letter of an individual who was fully conversant and experienced in these activities, and who followed his account closely. The letter is also significant for what it does not state. It contains no objections to the trading that had been conducted in the account up to that point. In fact, it expressed plaintiff's objection to the defendants' restriction of the trading, and limiting his use of further margin borrowing. Claims of unauthorized or improper,

Not Reported in F.Supp.                                                                             Page 5
(Cite as: 1997 WL 138989 (E.D.N.Y.))

unsuitable trading were not raised. While plaintiff alluded in his letter to Mr. Hayat's prior suggestion to move his account to another firm, he never acted on that suggestion.

A. *Options Trading in the Shearson Account*

As with his claims against Evans, plaintiff claims that the options trading in his Shearson account was done without his knowledge of the attendant risks. In support of that claim, plaintiff asserts that he was not provided with a Shearson option prospectus until June 1981, even though he began options trading with Shearson in January 1980. Claude Hayat, however, testified that the option prospectus was sent to plaintiff in December 1979. Tr. at 632. This was supported by the Shearson Option Suitability Form, Shearson Ex. EE, which included a notation that a prospectus had been forwarded to plaintiff on December 15, 1979. The Court finds this evidence believable. Even if plaintiff had not received a prospectus at that time, however, it remains clear that plaintiff would not have been prejudiced by that omission, because plaintiff clearly understood the mechanics of options trading and the risks that attended that process from his two years experience with options at Evans. As stated above, this Court finds that plaintiff's broker at Evans, Bernard Weinflash, informed plaintiff of the risks of options in 1978. Accordingly, this Court finds that notwithstanding any alleged delay in his receipt of the options prospectus, plaintiff was fully aware of the risks of options trading.

*6 Additionally, even if plaintiff had only received his options prospectus in 1981, he continued to trade options thereafter without interruption. Plaintiff regularly received account confirmations and statements, and was aware that he was suffering losses on his options trading. Despite this, he continued to trade options in his own account until he closed it in May 1983, and in his daughter's account until 1985.

III. *Similarity between the Evans and Shearson Accounts*

This Court's finding that Podgoretz maintained control over all his trading activity is further supported by the enormous similarities in trading which occurred in the Evans and Shearson accounts. In general, the trading activity follows a similar pattern, including the fact that of the 32 securities traded at Shearson, 26 of them were also traded at Evans, including at least six *identical* trades made on the same day at both accounts. For example, on July 21, 1980, Podgoretz bought ten November 35 calls of MacDonald Douglas at Evans and also bought ten November 35 calls of MacDonald Douglas at Shearson.

The defendant brokers, as well as their respective assistants from the relevant time period, all testified uniformly and credibly that they did not know, and had no communication, with each other, until the time the accounts were closed. Tr. at 647-48, 782-83, 809, 846. The documentary evidence supports these statements. Specifically, the Shearson new account form dated January 23, 1978, Shearson Ex. U, states "none" under the "other brokerage accounts with" query. This Court can only conclude, therefore, that the tremendous number of similarities in the Shearson and Evans trading activity reflects the fact that Podgoretz was controlling that activity himself. Given the enormous similarities, even if Weinflash and Hayat *had* known each other-- and this Court finds that they did not--they would have had to be in almost constant contact with each other to coordinate their activities, and to little, if any, advantageous purpose.

Plaintiff has also made claims against defendants based on the argument that they failed to obtain necessary information regarding plaintiff's background, ignored his status as a retiree with a limited income, and went ahead with an unsuitable, risky investment approach. This Court has found, as an initial matter, that defendants made few--if any--actual trade recommendations to plaintiff. To the extent that they did have any duty of suitability to plaintiff on those few trades, however, this Court finds that both Shearson and Evans were informed and that their account forms properly reflected plaintiff's age, income, assets, and other relevant information as provided to them by plaintiff. The fact that plaintiff supplied this information himself is supported by the fact that the Evans and Shearson forms each contain identical information. For example, the options forms for each account state identical income figures ($50,000, Evans Ex. N, Shearson Ex. EE, similar net worth figures ($200,000 Shearson Ex. EE and "over $100,000" Evans Ex. N), similar investment objectives (the most aggressive category on each form), and the same type of intended option trading (purchase of options and sale of covered options). As the Court

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1997 WL 138989 (E.D.N.Y.))

Page 6

has already accepted as credible the testimony of the brokers that they did not know each other, the similarity of this information is either the result of an extraordinary coincidence, or indicative of the fact that plaintiff provided this information to them.

### IV. *Plaintiff's Disabilities*

*7 Podgoretz claims, in part, that his deteriorating eyesight and inability to understand or speak English played a part in his necessary reliance on his brokers and allowed them to take advantage of him. Although it was clear that plaintiff was nearly completely blind at the time of trial, and that his English skills were not fluent, this Court does not find that those two factors necessarily impeded plaintiff's abilities as an investor during the time that the Evans and Shearson accounts were open. Plaintiff's wife, Asia Podgoretz, testified to the degeneration of plaintiff's eyesight, but was unable to recall when that occurred. Tr. at 99-100. Additionally, other witnesses credibly testified that from 1978-83, Podgoretz read journals and stock reports, Tr. at 839-40, and took copious notes on the documents he was reviewing. Tr. at 548. Plaintiff himself stated in a letter that he "followed" the papers, Pl.Ex. 2, expressly contradicting his trial testimony that he didn't read any English papers, and that he didn't know how to write or read. Tr. at 172-73. Finally, the statement which plaintiff repeatedly points to, written by Weinflash's assistant, Katherine Jeffers, that she "hope[s] [plaintiff's] eyes have improved," Pl.Ex. 11, is dated May 25, 1983, near the close of the Evans account, and does not, in and of itself, indicate the severity of plaintiff's eyesight problems.

### V. *Damages*

Plaintiff completely failed at trial to prove any legitimate damage figure. His primary proof was his own testimony--based on information he admitted his lawyer had told him--that he invested $150,000 into his Evans account, Tr. at 244-46, and $180,000 into his Shearson account. Tr. at 251. Plaintiff therefore claimed to have invested a total of $330,000 into both accounts, despite the fact that he also testified to having a total net worth of only approximately $250,000, and no form of income outside of social security checks. Tr. at 194-98, *see also* Plaintiff's Proposed Findings of Fact ¶ 14.

Defendants, in turn, seem to argue with legitimate foundation that Podgoretz sustained no overall trading losses in his Evans account and that his net investment into his Shearson account was approximately $41,000. They also accurately point out that although plaintiff admitted that some transactions in each account *were* done at his own direction, he failed at any point to distinguish which transactions were not authorized by him to form a basis for a damage award.

### CONCLUSIONS OF LAW

Plaintiff sets forth a variety of theories upon which to support his claims against defendants, including both securities law and common law theories of fraud, negligence, breach of fiduciary duty, unsuitability, and churning, as well as a civil RICO claim. Based on this Court's findings of fact, however, Podgoretz fails to establish any of these claims.

### I. *Churning*

Churning "refers to the excessive rate of turnover in a controlled account for the purpose of increasing the amount of commissions." *Armstrong v. McAlpin*, 699 F.2d 79, 90 (2d Cir.1983) (citing *Ruskay v. Waddell*, 552 F.2d 392, 393 n. 2 (2d Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977) and 11 A Part 1 Gadsby, *Business Organizations* § 6.03(5) (1982)). As a deceptive and manipulative device, churning is prohibited by Section 10(b) of the Securities and Exchange Act of 1934 ("SEA"), 15 U.S.C. § 78j(b), and may implicitly satisfy the scienter element which is required to prove a violation of that section.

*8 To prove a churning claim, a plaintiff must show: (1) the broker exercised control over the account; (2) the trading in the account was excessive in light of the customer's investment objectives; and (3) the broker acted with intent to defraud or with willful and reckless disregard for the customer's interest. *See Smith v. Petrou*, 705 F.Supp. 183, 187 (S.D.N.Y.1989) (citations omitted). As indicated by the above findings of fact, Podgoretz has failed to establish any of the three elements required for a churning claim. In particular, because this Court found that plaintiff was in control of his Evans and Shearson accounts, that he specifically directed the bulk of the trading in those accounts, and that neither Weinflash nor Nayat ever disregarded Podgoretz' interests as he

Not Reported in F.Supp.
(Cite as: 1997 WL 138989 (E.D.N.Y.))

Page 7

consistently presented them, Podgoretz fails to prove any of the three requisite elements to establish churning.

II. *Unsuitability*

The Second Circuit has recognized the viability of a SEA § 10(b) unsuitability claim and has stated that the elements which a plaintiff must establish to prove such a claim are: (1) that the securities purchased or sold were unsuited to the buyer's needs; (2) that the defendant knew or reasonably believed the securities were unsuited to the buyer's needs; (3) that the defendant recommended or purchased the unsuitable securities for the buyer anyway; (4) that the defendants, with scienter, made material misrepresentations or failed to disclose material information relating to the suitability of the securities; and (5) that the buyer justifiably relied to his detriment on the defendant's fraudulent conduct. *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1031 (2d Cir.1993) (citations omitted).

The Court has rejected plaintiff's claim that he wished to pursue a "conservative, income oriented" investment objective. The trial record amply demonstrates that Podgoretz was an active and aggressive trader who continued to pursue aggressive strategies over an eight year period, until his accounts were closed in May 1983. As noted previously, this Court has found that plaintiff directed the purchases and sales of securities in his Evans and Shearson accounts. Specifically, this Court found that defendant Claude Hayat, acting for Shearson, made *no* recommendations to Podgoretz on what securities to buy or sell, and that Bernard Weinflash, acting on behalf of Evans, made recommendations only with regard to a few of Podgoretz' trades. To the extent that Podgoretz did receive any recommendations from defendants, they were provided at the prompting of Podgoretz himself, and only after he had already directed numerous similar, aggressive trades on his own behalf. Given this context, and the fact that defendants' reasonably believed--because Podgoretz himself had told them--that Podgoretz had various sources of income and wanted to trade in options, this Court cannot find that for the few recommendations that defendants did actually make, they were unsuited to Podgoretz' needs, that defendants knew or reasonably believed them to be unsuitable, that the defendants made any material misrepresentations or omissions with regard to those few trades, or that Podgoretz relied in any way on defendants' conduct. In short, given this Court's findings that Podgoretz understood the risks which trading in options carried and the control he exercised over his own accounts, Podgoretz has failed to prove a claim of unsuitability against the defendants.

III. *Fraud*

*9 In addition to his specific claims of churning and unsuitability, Plaintiff also attempts to argue that defendants' actions generally amount to fraud under both the SEA and the common law.

A. *The Securities and Exchange Act.*

In accordance with Congress' goals to encourage public participation in the stock market by protecting investing members of the public from fraud, Section 10(b) of the SEA, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated under the SEA, 17 C.F.R. § 240.10b-5, were designed to prohibit fraudulent, manipulative, and deceptive schemes in connection with the purchase or sale of any security.

Rule 10b-5 expressly prohibits "any person ... [t]o employ any device, scheme, or artifice to defraud ... [or] ... [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. To establish a Rule 10b-5 violation, a plaintiff must establish (1) damage, (2) caused by reliance on defendant's misrepresentation or omission of material facts, or on a scheme by defendant to defraud, (3) made with an intent to deceive, manipulate or defraud (scienter), (4) in connection with the purchase or sale of securities, and (5) furthered by defendant's use of the mails or any facility of a national security exchange. *Smith v. Petrou*, 705 F.Supp. 183, 186 (S.D.N.Y.1989) (citations omitted)

Plaintiff has clearly failed to prove any of the required elements to establish that defendants generally acted to defraud, manipulate, or deceive him. Podgoretz was a diligent investor who made his own investment decisions on the basis of research that he either personally performed, or specifically requested from the defendants. Defendants made no misrepresentations or

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1997 WL 138989 (E.D.N.Y.))

Page 8

omissions of material facts in connection with Podgoretz' accounts. In fact, other than his general claims that he always relied on defendants for direction, a claim this Court has rejected, plaintiff made no attempt to identify precisely what kind of misrepresentation or omission defendants engaged in with respect to any particular investment. Apparently, plaintiff's claim relies on the implicit suggestion of wrongful omission in defendants not advising him of the risks of his trading, particularly of option trading. This Court, however, has already held that Podgoretz was aware of these risks from the specific oral advice he received from his broker at Evans, from the written option disclosure booklet sent to him by Shearson in December 1979, and from his own diligent efforts in following his account activity.

Plaintiff has alleged that he suffered losses from the purchase of call options which later expired as worthless. Apart from the credible testimony of Bernard Weinflash recounting how he told plaintiff that options are wasting assets, Tr. at 724, plaintiff knew or should have known of this risk after the first time one of his options expired--which took place at least as early as October 1978. Evans Ex. A (5 Teledyne calls expired). This was nearly 16 months before plaintiff even began trading at Shearson, yet he claims he had no concept of the risk throughout the following years.

*10 Plaintiff's other conduct after learning of these risks also undercuts any claim of detrimental reliance. By his own choice, plaintiff continued to invest in options trading at both Shearson and Evans after he was told of the risks thereof, and after he learned of those risks firsthand by suffering losses in those trades.

Plaintiff was an involved and informed investor who was diligent in directing and following his own accounts' activities--he clearly was not "induced" to rely on other's suggestions. For the same reasons, plaintiff has failed to prove any scienter on the part of the defendants. There were no misrepresentations or omissions made, and there was accordingly no wrongful knowledge or even recklessness to accompany such misrepresentations or omissions.

B. *Common Law.*

Under New York law, a plaintiff who claims to have been defrauded must establish (1) a material misrepresentation of fact, (2) scienter, (3) justifiable reliance on the misrepresentation, and (4) injury to the plaintiff. *See Jaksich v. Thomas McKinnon Securities, Inc.,* 582 F.Supp. 485, 502 (S.D.N.Y.1984) (citations omitted). Plaintiff has the burden of proving these elements by clear and convincing evidence, rather than the preponderance of evidence standard used in actions for fraud under SEA § 10(b) and Rule 10b-5. These elements closely resemble those for a securities fraud claim under Rule 10b-5, and, as set forth above, they have not been established in this case.

IV. *Negligence.*

Plaintiff also argues that defendants acted negligently with regard to his accounts. Although plaintiff failed to specify which "duty" was breached by defendants at any time prior to or during trial, he broadly asserts in his post-trial brief that defendants breached their fiduciary duty, duty of competence, and duty to follow their own internal compliance rules with regard to plaintiff and his accounts.

Podgoretz, as an active and aggressive trader who personally monitored his account activity on a daily basis, did not generally rely on the advice of his brokers. Indeed, he ignored the specific advice of Bernard Weinflash to avoid option trading because of the risks involved, and he used Shearson and its employees basically as a service to place his orders. Under these circumstances, it is clear that any losses which plaintiff suffered were due to his own actions and not to any breach on the part of defendants.

A broker must deal fairly with a customer, and as an agent of his customer, he must exercise "the utmost good faith" toward his client, *see Pachter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 444 F.Supp. 417, 422, 423 (E.D.N.Y.), *aff'd,* 594 F.2d 852 (2d Cir.1978). It was clear from the evidence presented at trial in this case that both Evans and Shearson and their employees, Bernard Weinflash and Claude Hayat, acted reasonably, fairly, and with the utmost good faith toward Podgoretz, who presented himself as an informed and active investor following his own course with little input from them. This Court accordingly finds that defendants did not act negligently in any way with regard to Podgoretz' accounts.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1997 WL 138989 (E.D.N.Y.))

Page 9

### V. RICO.

*11 Finally, plaintiff argues that defendants' actions state a claim for relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. To succeed with his RICO claim, Podgoretz must prove, in part, two or more predicate acts upon which this Court may find a "pattern of racketeering activity" conducted by the defendant enterprise. See Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir.1983), cert. denied, Moss v. Newman, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). Plaintiff incorporates by reference his earlier claims of securities fraud to constitute at least one of the requisite predicate acts. Because this Court has found that Podgoretz failed to prove any of those claims, he cannot succeed with his RICO claim.

### VI. Ratification.

While Plaintiff failed to prove any of his claims at trial, the Court notes that even if he *had* established that defendants traded without his authorization, Podgoretz' failure to object to those trades upon receipt of individual confirmation slips and monthly statements constitutes a ratification of those trades. See, e.g., Jaksich v. Thomson McKinnon Securities, Inc., 582 F.Supp. at 502.

In this case, plaintiff raised no objections to the trading in his Shearson or Evans account until the trading in each account had ceased. Plaintiff himself admitted that he received confirmation slips and monthly statements from the brokerage firms, but remained silent regarding the trades to which he now so vigorously objects. This silence extended for over eight years, from January 1975 until April 1983, during which time plaintiff's trading continued unabated. When plaintiff first raised an objection to his Shearson account activity, Shearson Ex. I, he complained of the *restriction* of further margin trading rather than the trades themselves.

Additionally, the Evans Customer Agreement, which Podgoretz signed, specifically provided that "[r]eports of the execution of orders and statements of the account of the undersigned shall be conclusive if not objected to in writing, and the former within two days, the latter within ten days, after forwarding by you to the undersigned by mail or otherwise." Evans Ex. 1 ¶ 7. Such broker-customer agreements are generally enforced by courts. *Modern Settings, Inc. v. Prudential-Bache Securities, Inc.*, 936 F.2d 640, 646 (2d Cir.1991) (citations omitted). Despite this specific provision, the record is void of a single incident where Podgoretz objected to a single trade within even a year--much less the requisite ten days--of the execution of the trade. Rather, Podgoretz did not object to any trade until after the close of his account.

Plaintiff's complete silence only further supports the evidence presented at trial and this Court's finding that the trading in his account was done at his direction, and in accordance with his investment objectives. Even if this Court had found otherwise, however, Podgoretz' silence would bar his claims.

### CONCLUSION

*12 For the reasons stated herein, this Court finds plaintiff's claims against defendants to be without merit. The Clerk of the Court is therefore directed to enter judgment in favor of defendants in this action and to close this case.

SO ORDERED.

1997 WL 138989 (E.D.N.Y.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

http://print.westlaw.com/delivery.html?dest=atp&dataid=A005580000002206000230781 2B... 5/6/2004